# Order

**Michigan Supreme Court**
**Lansing, Michigan**

December 21, 2011

Robert P. Young, Jr.,
Chief Justice

Michael F. Cavanagh
Marilyn Kelly
Stephen J. Markman
Diane M. Hathaway
Mary Beth Kelly
Brian K. Zahra,
Justices

141559-60

THOMAS LaMEAU, Personal Representative of
the Estate of John M. Crnkovich, Deceased,
          Plaintiff-Appellee,

v

CITY OF ROYAL OAK, ELDEN DANIELSON,
and BRYAN WARJU,
          Defendants-Appellants,
and

DETROIT EDISON COMPANY and GAGLIO
PR CEMENT CORPORATION,
          Defendants-Appellees.

SC: 141559-60
COA: 290059, 292006
Oakland CC: 07-083761-NO

_____/

On October 5, 2011, the Court heard oral argument on the application for leave to appeal the July 13, 2010 judgment of the Court of Appeals. On order of the Court, the application is again considered. MCR 7.302(H)(1). In lieu of granting leave to appeal, we REVERSE the judgment of the Court of Appeals, for the reasons stated in the Court of Appeals dissenting opinion, and we REMAND this case to the Oakland Circuit Court for entry of an order granting summary disposition to the public defendants.

CAVANAGH and HATHAWAY, JJ., would deny leave to appeal.

MARILYN KELLY, J. (*dissenting*).

I dissent from the Court's order reversing the judgment of the Court of Appeals and remanding this matter to the trial court for entry of summary disposition in favor of defendants. By rubber-stamping the Court of Appeals dissenting opinion, the majority fails to address the dispositive issues with the thoughtful analysis needed in this case.

The order is the quintessential example of a practice the Court has used more and more of late: a majority resolves a case without writing an opinion.[1] I oppose extensive

---

[1] See, e.g., *Whitmore v Charlevoix Co Rd Comm*, ___ Mich ___ (Docket No. 142106, decided December 21, 2011); *Findley v DaimlerChrysler*, ___ Mich ___ (Docket No. 141858, decided December 9, 2011); *Estate of Jilek v Stockson*, ___ Mich ___ (Docket No. 141727, decided December 21, 2011); *Jones v Detroit Med Ctr*, ___ Mich ___ (Docket Nos. 141624, 141629, decided December 21, 2011); *McCue v O-N Minerals*, ___ Mich ___ (Docket No. 142287, decided December 16, 2011).

use of this practice because it allows the Court to avoid providing comprehensive legal analysis to support its conclusions.  It also omits needed guidance to lower courts, litigants, and the public.  For reasons that I will detail, the Court of Appeals dissent is an inadequate substitute.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case stems from a fatal accident that occurred on a sidewalk in the city of Royal Oak.  Most of the sidewalk was installed in the summer of 2005.  It runs alongside a fence adjacent to the city's high school.  However, as the attached photographs show, two utility wires were anchored in the walkway.  They belonged to Detroit Edison Company and Ameritech.  When construction was underway, the city was concerned about the wires and allegedly invited representatives from the utility companies to meet to discuss relocating them.  Neither company sent a representative to the meeting.  Ameritech later moved its wire.  Detroit Edison did not, as shown in the attached photographs.

The city proceeded with its sidewalk construction project despite the presence of Detroit Edison's wire.  Bryan Warju, the city's construction project field manager, observed that Detroit Edison had historically provided untimely responses to requests to move its wires and anchors.  Gaglio PR Cement Corporation, a contractor on the project, specifically warned Warju of the dangers Detroit Edison's wire posed to people moving along the sidewalk.  Gaglio proposed leaving 10 sidewalk pieces unfinished on either side of the wire to discourage traffic near it.  But Warju, whose responsibility it was to ensure that the project be timely completed, instructed Gaglio to finish the sidewalk except at the location of the wire and its anchor.  That area was covered in asphalt, enclosing the wire's anchor and leaving the wire in place.  In an effort to thwart pedestrian traffic, he further instructed Gaglio to barricade the area.  Gaglio believed that barricades would not stop the public from using the pathway and told Warju that people would "kick over our barricades and walk through."

Nonetheless, Gaglio allegedly placed several types of barricades around the area, including fencing, barrels, and cones.  It also hung "caution" tape and flags from the wire, which was sheathed in a yellow covering.  Yet, as Gaglio predicted, passersby repeatedly set aside or removed the barricades.  Children were seen playing with the barricades or removing them.  Gaglio personnel inspected the site daily to check on the barricades and put them back in place.

On April 24, 2006, a bicyclist fell from his bike at the location of the wire.  Royal Oak police informed Detroit Edison of the accident, but still the company failed to move the wire.  On May 17, 2006, a second bicycle accident occurred at the site.  Again Detroit Edison did nothing, despite the obvious hazard its wire posed.

On the evening of May 24, 2006, John Crnkovich had been partying at a friend's house nearby and had consumed alcohol and marijuana. His blood alcohol content was 0.13 percent. He drove his motorized scooter along the sidewalk. Crnkovich had no protective gear or safety helmet, and his scooter had no light. He crashed into the wire, severed his spinal cord at the C3 and C4 vertebrae, and died.

Plaintiff, Crnkovich's personal representative, brought suit against the city, city engineer Elden Danielson, Warju, Detroit Edison, and Gaglio. Count I of the complaint alleged that Detroit Edison negligently placed the wire and negligently failed to move it. Count II alleged that the city breached its duty to maintain the sidewalk in reasonable repair. Count III alleged that Gaglio breached its duty to perform its contract in a workmanlike manner by building an unsafe sidewalk. Counts IV through IX alleged various nuisance claims. Counts X and XI alleged that Danielson and Warju were grossly negligent in planning and constructing the sidewalk.

The city sought summary disposition on the basis of governmental immunity, arguing that the wire and anchor were part of the telephone pole and thus expressly excluded from the highway exception.[2] Danielson and Warju moved for summary disposition as to their individual liability, arguing that their actions were not grossly negligent and that their conduct was not the proximate cause of Crnkovich's death. The trial court granted the city's motion with respect to plaintiff's nuisance claims, but denied summary disposition of the negligence claim against the city and the individual defendants.

The city, Danielson, and Warju again moved for summary disposition. This time, defendants argued that plaintiff had failed to establish that the sidewalk was the cause of Crnkovich's death. They further argued that it was Crnkovich's reckless behavior that had caused the accident. They added as causes (1) Detroit Edison's failure to respond to the city's requests to move the wire, (2) the removal of the barricades by unknown persons, and (3) Gaglio's failure to ensure that barricades were in place at the time of the accident. Defendants also argued that Crnkovich's wrongful conduct and intoxication barred him from recovering as a matter of law.

Before the trial court ruled on defendants' second motion for summary disposition, the city appealed the trial court's denial of its first motion for summary disposition premised on governmental immunity. The trial court then denied Danielson's and Warju's motions for summary disposition, ruling that questions of fact existed on the issues of gross negligence and proximate cause. The trial court also denied the city's motion for reconsideration. The Court of Appeals consolidated the appeals of the city and of the individual defendants.

---

[2] MCL 691.1402.

In a split decision, the Court of Appeals affirmed the trial court's decisions in all respects.[3] It held that the anchor and wire were part of the sidewalk itself, rather than conditions external to the sidewalk. It held that the sidewalk was open to the public given that the barricades were routinely moved out of place. It further held that a reasonable jury could conclude that the individual defendants were grossly negligent given the repeated warnings they had received about the dangers the wire posed. Finally, it held that a genuine issue of material fact existed concerning whether Danielson's and Warju's conduct in creating and failing to rectify the hazard had immediately and directly caused Crnkovich's death. The city and the individual defendants sought leave to appeal in this Court. We granted oral argument on their application.[4]

## II. ANALYSIS

The Court's order granting oral argument on defendants' application for leave to appeal specified several issues for the parties to address. Yet its order disposing of the case ignores those issues. The Court of Appeals dissent, on which the majority relies, did not address them either. Moreover, the analysis that the Court of Appeals dissent did undertake is both without factual basis and erroneous as a matter of law.

### A. WHETHER THE SIDEWALK WAS OPEN FOR PUBLIC TRAVEL

Perhaps the most elementary of the issues presented in our order granting oral argument on defendants' application for leave to appeal is whether the sidewalk was open for public travel. However, there is a question prefatory to its resolution: whether a sidewalk must be open for public travel to fall within the highway exception to governmental immunity. Although neither the Court of Appeals majority nor dissent addressed this question, I believe its resolution is necessary for a thorough consideration of the issues presented.

MCL 691.1401(e) defines "highway" as "a public highway, road, or street that is open for public travel and includes bridges, sidewalks, trailways, crosswalks, and culverts on the highway." The city argued that this definition compels the conclusion that the sidewalk in question does not qualify as a highway. This is because the city intended that it not be open to the public during construction. However, for this argument to prevail, the city must establish that the phrase "open for public travel" is applicable to sidewalks as identified in the second clause of MCL 691.1401(e). In my estimation, it is not.

---

[3] *LaMeau v Royal Oak*, 289 Mich App 153 (2010).

[4] *LaMeau v Royal Oak*, 488 Mich 1052 (2011).

The first step in interpreting a statute is to analyze its language.[5] The provision at issue here, MCL 691.1401(e), lists several specific structures in addition to roads and streets: sidewalks, trailways, crosswalks, and culverts on the highway.[6] It does not appear that these structures must be "open for public travel" in order to qualify for inclusion under the highway exception. The most obvious indication that this was the Legislature's intent is that the Legislature included culverts among the structures that fall within the definition of "highway." A "culvert" is "a drain or channel crossing under a road, sidewalk, etc. . . . ."[7]

Under any commonsense interpretation, culverts are not "open for public travel." It follows that the other structures identified in the second clause of the statute are also not modified by the language "open to public travel" from the first clause. Rather, it is only the structures in the first clause—public highways, roads, or streets—that must be open for public travel in order to fall within the highway exception. Hence, defendants are not entitled to summary disposition even if there were adequate barricades in place at the time of the accident.

If a sidewalk must be open to public travel to fall within the highway exception to governmental immunity, there is strong evidence that the sidewalk here was open to public travel. The city seizes on the fact that, at one time, barricades of varying kinds were in place around the sidewalk. Those barricades allegedly included fencing, cones, flags, and safety barrels. But the essential fact, one that the city cannot dispute, is that the barricades were gone and the sidewalk *was* open to the public on the night of Crnkovich's death. The attached photographs taken by police on the night of the accident show a barrier-free sidewalk. Furthermore, it is undisputed that at least two other bicyclists had been injured earlier at the same location. Because pedestrians, bicyclists, and other sidewalk users could traverse the area in question, it appears that the sidewalk was open to public travel.

The Court of Appeals dissent did not opine on this issue, and this Court's majority relies solely on that dissent. Hence, it appears that the majority agrees with my position that sidewalks need not be open to public travel to fall within the highway exception. Alternatively, the majority concedes that the sidewalk in this case was open to public travel.

---

[5] *Briggs Tax Serv, LLC v Detroit Pub Sch*, 485 Mich 69, 76 (2010).

[6] In its entirety, MCL 691.1401(e) provides: "'Highway' means a public highway, road, or street that is open for public travel and includes bridges, sidewalks, trailways, crosswalks, and culverts on the highway. The term highway does not include alleys, trees, and utility poles."

[7] *Random House Webster's College Dictionary* (2001).

## B. WHETHER THE WIRE CONSTITUTED A "DEFECT" IN THE SIDEWALK

The Court of Appeals dissent concluded that "[t]he relevant statutory language [in MCL 691.1401(e)] specifically excludes utility poles, and it is disingenuous to suggest that any appendage extending from a utility pole should be treated as a separate or distinguishable entity."[8] Thus, it concluded that the wire did not constitute a defect within the meaning of MCL 691.1402a.[9]

The relevant statutory definition of "highway" in MCL 691.1401(e) and the language of MCL 691.1402a specifically *include* the maintenance and repair of sidewalks within the scope of municipalities' duties. Thus, to borrow from the Court of Appeals dissent's approach, it is disingenuous to suggest that any appendage extending from *the sidewalk* should be treated as a separate or distinguishable entity.

The attached photographs show that the wire was made part and parcel of the sidewalk when its anchor was embedded therein. At a minimum, the wire was at least equal parts sidewalk and utility pole because it was physically connected at either end to both structures. Alternatively, the wire could be considered part of the utility pole. But if that were the case, the Legislature could not have intended to include within the scope of governmental immunity a utility pole or its appendages embedded in the sidewalk itself.

Thus, the city, having a duty to maintain the sidewalk and keep it in reasonable repair, arguably breached its duty by leaving the wire embedded in the sidewalk. Whether in this case the city satisfied its duty under MCL 691.1402(1) is a question for the trier of fact—one that should not be resolved by summary disposition. The majority's adoption of the analysis and conclusion of the Court of Appeals dissent is misplaced.[10]

## C. WHETHER THE INDIVIDUAL DEFENDANTS WERE GROSSLY NEGLIGENT IS A QUESTION OF FACT

The third dispositive question presented in this case is whether the conduct of the individual defendants can be considered grossly negligent, in which case those

---

[8] *LaMeau*, 289 Mich App at 188 (TALBOT, P.J., dissenting).

[9] Municipalities have a duty to repair and maintain sidewalks under MCL 691.1402(1). However, under MCL 691.1402a(1)(a) and (b), the municipality must have been aware of the defect at least 30 days before the injury and the defect must have proximately caused the injury for liability to arise.

[10] The Court of Appeals dissent also relied heavily on *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143 (2000), and *Buckner Estate v City of Lansing*, 480 Mich 1243 (2008), to support its conclusions. For the reasons stated in my dissenting opinions in those cases, I continue to believe those cases were wrongly decided.

defendants are not entitled to governmental immunity. The Court of Appeals dissent summarily concluded that, in addition to the city, the individual defendants are entitled to summary disposition. However, the question of whether those defendants were grossly negligent is a question of fact for the jury.

MCL 691.1407(2) provides that governmental employees are generally immune from tort liability unless the employees' conduct amounted to gross negligence that was the proximate cause of an injury. MCL 691.1407(7)(a) defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."

Viewing the facts in a light most favorable to the nonmoving party,[11] it is apparent that the majority has usurped the function of the jury and assumed the role of the finder of fact. Because the Court of Appeals majority thoroughly and thoughtfully analyzed whether the individual defendants' conduct could be considered grossly negligent by a reasonable jury, I adopt its analysis:

> On appeal, Danielson and Warju frame the issue in terms of their conduct after the construction of the sidewalk at issue. That is, they argue that the evidence concerning the steps that they took to barricade the sidewalk and to get Detroit Edison to move the anchor and guy wire did not show that their conduct rose to the level of gross negligence; instead, they contend that "[i]f such a minor level of negligence is sufficient to avoid immunity, immunity for individuals based upon gross negligence would be undermined, if not abrogated." However, the proper focus is not solely on the evidence concerning the steps they took *after* creating the defect in the sidewalk. Rather, the totality of their conduct—including their actions leading to the creation of the defect in the sidewalk as well as the steps they took to remediate the defect—must be evaluated when determining whether their actions could be found to amount to gross negligence. Indeed, if the defect had not been created in the first instance, then there would have been no need to remediate it.

> Although the sidewalk project called for the placement of the sidewalk through the area occupied by the anchor and guy wire, the decision to place the sidewalk along this path was not inherently negligent—let alone grossly negligent—given that the anchor and guy wire could have been relocated. Indeed, there was evidence that another utility was able to timely move its own anchor and guy wire. However, once

---

[11] See *Dressel v Ameribank*, 468 Mich 557, 561 (2003) (holding that, when reviewing motions for summary disposition, we consider the facts in a light most favorable to the nonmoving party).

Gaglio Cement began to prepare the area and pour concrete flags, both Rosalino and Salvatore Gaglio noticed that the anchor and guy wire had not been relocated and informed Warju of the need to move it. Nevertheless, Warju ordered them to proceed with the project and told them to just block the area off. Rosalino disagreed with this course and urged Warju to leave a substantial distance—50 feet in either direction—unpaved for safety purposes. Despite Rosalino's protestation that people would get hurt, Warju told them to pave right up to the anchor and guy wire and leave just one flag unpaved.

Sometime later, Warju asked Salvatore to fill the missing flag with asphalt. Salvatore again warned Warju against paving the area before the guy wire was relocated, but Warju said, "[J]ust put it there, and then next year when you guys come back, you guys can fill it in with the concrete." Salvatore said that he also warned Warju that if they put asphalt in there, people were just going to "kick over our barricades and walk through." He said that Warju told him not to "worry about it, we'll just keep an eye on it."

When asked whether Warju could have halted the project to await the relocation of the anchor, Danielson admitted that he could have done so, but explained that there was no policy requiring that. Instead, he said the proper procedure is to complete the project and barricade the hazard area. Similarly, when asked to explain why he did not leave the area unpaved, Warju explained: "Well, we are on a schedule to do the sidewalk. We are coming down that street. We are not going to stop and wait for nine months in this case for Detroit Edison to relocate their wire along with other objects which are in the way."

The testimony concerning the events leading up to the creation of the hazard strongly suggested that Danielson and Warju were indifferent to the magnitude of the danger being created. The anchor and guy wire posed a clear danger even to pedestrians traversing the paved portion of the sidewalk. Yet the danger increased dramatically for persons moving at any speed greater than a walk—the location of the fence on one side and of wires and poles on the other made it difficult for any person moving at such a speed to avoid the hazard, and the height of the guy wire rendered anyone who failed to avoid it in danger of sustaining a head or neck injury. Given this evidence, Danielson and Warju should have realized the seriousness of the hazard they were creating by ordering that the sidewalk be paved before moving the anchor and guy wire. On the basis of this evidence, a reasonable jury could conclude that the decision to incorporate the anchor and guy wire into the sidewalk demonstrated "a substantial lack of concern

for whether an injury results." MCL 691.1407(7)(a); *Maiden* [*v Rozwood*, 461 Mich 109, 122-123 (1999)] (stating that, in order to survive a motion for summary disposition premised on governmental immunity for governmental employees, a plaintiff must adduce proof of conduct so reckless that it demonstrates a substantial lack of concern for whether an injury will result). Even if Danielson and Warju did not fully appreciate the danger, the evidence also showed that they were repeatedly warned about the danger posed by paving up to the anchor and guy wire, yet ordered Gaglio Cement to proceed anyway.

Further, although there was evidence that Danielson and Warju contacted Detroit Edison about moving the anchor and guy wire, the evidence also suggested that Danielson's and Warju's efforts in this regard were deficient. Neither Danielson nor Warju ever formally requested Detroit Edison to relocate the anchor and guy wire. Warju did send a letter to Detroit Edison advising it of a meeting concerning the project, and in the letter he noted that any conflicts with utilities would be discussed at the meeting, but he addressed the letter to a person who was not located at the office to which the letter was addressed and who was not responsible for resolving utility conflicts. Likewise, although Danielson testified that he contacted various Detroit Edison personnel about moving the anchor and guy wire, he admitted that the requests were oral, and the evidence showed that some of these communications occurred during discussions about other projects. In addition, there was evidence from which one could conclude that Detroit Edison did not receive any requests—oral or otherwise—to move the anchor and guy wire. Thus, there was evidence from which a reasonable fact-finder could conclude that the efforts to have the anchor and guy wire relocated were not just deficient, but grossly deficient.

The evidence also showed that Danielson's and Warju's efforts to safeguard the public from the hazard they created were inadequate. Although there was evidence that the sidewalk was barricaded at the point of the hazard, there was also evidence that the barricades were repeatedly moved or stolen. Rosalino testified that he warned Warju over and over again about the problem with the barricades and told him that the guy wire had to be moved; he even expressed exasperation over the fact that the guy wire had not been moved after eight months. Moreover, the photographs from the accident at issue showed no sign of any barricade within the vicinity of the anchor and guy wire. There was also evidence that the general public was using the sidewalk before the accident at issue. The evidence showed that two bicyclists were injured while encountering the hazard and that Royal Oak clearly had notice of one of those accidents

because its fire department responded and generated a report about the guy wire at issue.

When the totality of the evidence and the testimony concerning the events at issue is viewed in a light most favorable to LaMeau, there is a clear question of fact about whether Danielson and Warju were grossly negligent. The evidence showed that Danielson and Warju created the hazard at issue by paving a path right up to and including the anchor and guy wire notwithstanding the evident serious danger. The evidence also showed that their efforts to have the anchor and guy wire moved were deficient and untimely, and that they ignored the fact that the barricades were inadequate and that the general public was using the sidewalk. Taken together, this conduct could be found to be "so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(7)(a). Accordingly, the trial court did not err when it concluded that there was evidence from which a finder of fact could conclude that Danielson and Warju were grossly negligent. [*LaMeau*, 289 Mich App at 176-180.]

In sum, there was ample evidence, if believed, that would support a finding that the individual defendants were grossly negligent. Rather than address this issue with thoughtful legal analysis, the majority treats it as immaterial to resolution of the case.

## III. CONCLUSION

The trial court and the Court of Appeals majority correctly determined that neither the city nor the individual defendants are entitled to summary disposition. The majority reverses those decisions, adopting the flawed analysis of the Court of Appeals dissent. Accordingly, I dissent.











I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

December 21, 2011



Clerk

t1214